UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JOSEPH TEAL,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )   Case No. 1:11CV191 SNLJ/FRB
                                      )
CAROLYN W. COLVIN,[1] Commissioner    )
of Social Security,                   )
                                      )
            Defendant.                )

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on plaintiff Joseph Teal's appeal of an adverse decision of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

## I.    Procedural History

Plaintiff Joseph Teal ("plaintiff") applied for Supplemental Security Income under Title XVI of the Act, alleging that he became disabled on January 1, 2007. (Administrative Transcript ("Tr.") 160-66). Plaintiff's applications were initially denied, and he requested and received a hearing before an

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case. No further action needs to be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

administrative law judge ("ALJ") which was held on May 10, 2011. (Tr. 26-56). On May 23, 2011, the ALJ issued a decision in which he determined that plaintiff was not disabled under the Act. (Tr. 7-20).

Plaintiff sought review from defendant agency's Appeals Council, which denied his request for review on September 7, 2011. (Tr. 1-3). The ALJ's decision thus stands as the Commissioner's final decision subject to review by this Court under 42 U.S.C. § 405(g).

## II.    Evidence Before The ALJ

### A.    Plaintiff's Testimony

Plaintiff testified that he was a high school graduate, was divorced, lived in a two-bedroom mobile home with his five children, and received temporary public assistance. (Tr. 31, 35). He testified that he had a valid driver's license, but did not drive due to seizures. (Tr. 32). Plaintiff last worked in 1998 in the finishing department at Lee Rollin, a position that required him to stand all day and lift 300 pounds. (Tr. 32-33). Plaintiff testified that he was terminated when he missed too many days of work due to illnesses including an ulcer. (Tr. 33). Previously, plaintiff had worked as a shipping clerk and dock worker, a job that required him to lift between five and 150 pounds. (Id.) Plaintiff testified that he had worked steadily until 1998, at which time he began experiencing weakness and pain in his legs that felt like his muscles were being pulled apart. (Tr. 33-34).

When asked why he could no longer work, plaintiff replied "[m]y physical condition, my weakness and the legs and the arms. But basically the physical condition." (Tr. 34). Plaintiff testified that he experienced leg weakness on an irregular and unpredictable basis, and did not know when the weakness would occur. (Id.) He testified that the weakness lasted from five minutes to hours, and seemed to be precipitated by "[b]asically doing anything." (Tr. 35). Plaintiff testified that, when he was experiencing leg weakness, he had to lay or sit down for 30 minutes to several hours. (Tr. 36).

Plaintiff testified that he also experienced similar problems with his arms, including weakness and a sensation that his muscles were being pulled apart. (Id.) Plaintiff testified that he sometimes lost all arm strength and dropped objects, and that these symptoms occurred the more he used his arms. (Tr. 36-37). When asked whether there was an amount of weight he could lift, plaintiff explained that weight did not matter, and "[i]t could be as simple as picking up a few pieces of clothes off the floor or I could pick up a gallon, like a gallon of milk is hard for me to lift up." (Tr. 37). He stated that he could not reach all the way overhead or in an outstretched manner when lifting, that his hands hurt, and that loss of strength affected his ability to hold objects, grip, or grasp. (Id.) When asked whether he could use his hands to type or hold a pen, plaintiff replied "I have arthritis in my hands that will start bothering me after a while. As for being in front of a computer right up in front of me I can't

do because I get dizzy and motion sickness." (Tr. 38). Plaintiff testified that he also experienced severe pain in his calves down into his feet that felt like "somebody is sticking a bunch of needles into them." (Id.)

Plaintiff testified that he could sit for only ten minutes and that, as he sat in the hearing room, his legs were hurting and his neck had been bothering him all day. (Tr. 38-39). He stated that he could stand for sometimes 30 minutes and sometimes less. (Tr. 48). He testified that he could walk for varying distances, and that he sometimes walked around his mobile home to exercise his muscles, but that other times he could not walk across the floor. (Id.) He stated that he spent most of his time sitting in a reclined position. (Id.)

Plaintiff testified that he suffered from seizures that he described as "zoning out" or blacking out, and explained that he could be looking straight at a person but not realize the person was there. (Tr. 39). He testified that he once ran off the road while driving because of this. (Tr. 39-40). Plaintiff testified that these seizures occurred on an irregular and unpredictable basis, and lasted for various lengths of time. (Tr. 40-41). Plaintiff testified that he also suffered from mood swings, including depression and anxiety. (Tr. 41-42). Plaintiff stated that he took his medications as prescribed, but that they caused him to feel sleepy, and plaintiff speculated that perhaps the "zoning out" was due to medication. (Tr. 42).

Plaintiff described an average day as waking at five

-4-

a.m., and trying to see what he could do that day, such as pick up a few items of clothes. (Tr. 43). Plaintiff testified that he woke his children at six a.m. for school, "and from then on it's, it's a random at what happens. Like if, what I'm able to do, if I feel like, if I feel pretty good and stuff I'll go on and try to do a little washing or something." (Id.) Plaintiff stated that there were days he felt so weak and exhausted he felt that he could not walk across the floor. (Id.) He stated that he was having such days more now than in the past and was unable to do most household chores, and that his children did most of the laundry and all of the cooking. (Id.) Plaintiff testified that he was not permitted to use a saw or a lawnmower. (Tr. 44). He stated that he had trouble watching television due to motion sickness. (Id.) Plaintiff testified that he could no longer engage in his hobbies of art, woodworking, listening to music, or reading as he once did. (Tr. 44, 46).

Plaintiff testified that he took Neurontin,[2] Ranitidine,[3] Synthroid,[4] Prozac,[5] and that he was also currently taking Bactrim[6]

---

[2]Neurontin, or Gabapentin, is used to help control certain types of seizures in patients who have epilepsy. It is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles).
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

[3]Zantac, or Ranitidine, is used to treat ulcers, gastroesophageal reflux disease (GERD), and conditions where the stomach produces too much acid.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html

[4]Synthroid, or Levothyroxine, is a thyroid hormone used to treat hypothyroidism, a condition in which the thyroid gland does

to treat a staph infection. (Tr. 45). Plaintiff testified that he would like to return to work and had applied for jobs, but was told that he was too great of a risk. (Id.)

The ALJ then heard testimony from a vocational expert (also "VE"). After listening to various hypothetical questions posed by the ALJ, the VE testified as to various available jobs such hypothetical person could perform. (Tr. 48-53).

B. Medical Records

Records from Rivercity Imaging show that an August 4, 2004 MRI of plaintiff's cervical spine revealed some mild degenerative spondylosis, no disc protrustion, and no abnormal mass. (Tr. 263). An August 9, 2004 MRI of the soft tissue of the neck showed bulky lymphoid tissue involvement consistent with non-Hodgkin's lymphoma. (Tr. 264).

Records from Cross Trails Medical Center ("Cross Trails") show that plaintiff was seen on April 10, 2008 and reported having had thyroid cancer and having undergone thyroidectomy (surgical removal of the thyroid) in 1991. (Tr. 272). He reported

---

not produce enough thyroid hormone.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html

[5]Prozac, or Fluoxetine, is used to treat various conditions, including depression, obsessive-compulsive disorder, some eating disorders, and panic attacks.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

[6]Bactrim, or Co-trimoxazole, is a combination of trimethoprim and sulfamethoxazole, a sulfa drug. It eliminates bacteria that cause various infections, including infections of the urinary tract, lungs (pneumonia), ears, and intestines.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684026.html

tenderness in his back. (Tr. 273).

On September 8, 2008, plaintiff returned to Cross Trails with complaints related to hypothyroidism. (Tr. 270). He reported some low back pain. (Id.) Upon examination, he was alert and in no acute distress. (Id.) Physical, psychological and neurological examination were noted to be normal. (Tr. 271). He was told to exercise, stop smoking, comply with medication and follow-up care, and perform thyroid self-examinations. (Id.)

On December 8, 2008, he returned with the same chief complaint, as well as foot discomfort. (Tr. 268). However, plaintiff stated that he felt good, but had suffered an elbow strain while playing volleyball with his kids, and was taking Tylenol. (Id.) Plaintiff denied weakness in his foot. (Id.) He expressed concerns about hair loss. (Id.) He reported that he smoked tobacco, and was not interested in stopping. (Tr. 268). Upon examination, he was alert and in no acute distress. (Id.) Physical, psychological and neurological examination were normal. (Tr. 269). He was given a flu shot, told to walk daily, and to stop smoking. (Id.)

On March 4, 2009, plaintiff underwent a psychological evaluation with Paul W. Rexroat, Ph.D., a licensed psychologist. (Tr. 295-98). Dr. Rexroat noted that plaintiff had "some unidentified problem in his body that causes pain which causes him to collapse at times or to black out." (Tr. 295). Plaintiff reported a happy childhood, and being on the honor roll while in school. (Id.) He reported that he last worked in 1998, and had

worked in the past at an oil company, at a shoe company warehouse, and at a "Lee Rowan" factory. (Id.) Plaintiff reported having used marijuana from age 16 to 18 and trying acid once, but not using drugs since. (Id.) He reported that he occasionally drank a beer. (Tr. 295). He had never been treated by a psychiatrist or other mental health professional, and stated that, while his primary care physician prescribed Zoloft eight or nine years ago, he could not tolerate it. (Tr. 296). Plaintiff reported having driven himself to the examination. (Id.)

Dr. Rexroat noted that plaintiff's clothing was soiled and plaintiff was poorly groomed. (Id.) Plaintiff was not suspicious, anxious, tense or weepy, nor was he shaky or tremulous. (Id.) Plaintiff appeared to have a normal energy level and was alert and cooperative, and he exhibited a mildly restricted range of emotional responsiveness and a slightly flat affect. (Tr. 296). He had a normal gait and posture and his speech was normal, coherent, and relevant, with no evidence of flight of ideas or loosening of associations or other abnormalities of speech that would indicate the presence of a thought disorder. (Id.)

Plaintiff reported occasional mood swings, but stated that anxiety was not a problem for him. (Id.) He reported being depressed due to his health problems, explaining that he did not want to get up in the morning and did not want to do the things he usually did, and reported feeling sad and having withdrawn from others. (Id.) He reported crying two or three times per week, reported feeling as though he had disappointed his children, and

reported irritability, hopelessness, helplessness, and poor outlook. (Tr. 296). He reported occasional passive suicidal ideation but no attempts. (Id.) He reported some sleep problems, but a normal appetite. (Id.)

Regarding plaintiff's cognitive functioning, Dr. Rexroat noted that plaintiff was well and fully oriented, and his memory for events in his past was fair. (Id.) Plaintiff was able to recite five digits forward and five digits back; delayed, recent and remote memory were intact, and plaintiff was able to name the current president and name four large U.S. cities. (Tr. 296). He was able to solve simple problems in all four basic math operations. (Tr. 296-97). Dr. Rexroat estimated plaintiff's I.Q. as average. (Tr. 297).

Dr. Rexroat noted that plaintiff exhibited significant symptoms of major depression with very mild psychotic features. (Id.) He was able to understand and remember simple instructions; he could sustain concentration and persistence with simple tasks, and he could adapt to his environment, but he had mild limitations in his ability to interact socially. (Id.)

Dr. Rexroat noted that plaintiff lived with his five children, and was not working. (Id.) He reported that he did laundry, cooked, and swept occasionally; went shopping with his children who helped him; drove a minivan; watched two hours of television per day; read the Bible and history books; and claimed that he used to draw for a comic book in St. Louis. (Tr. 297). Dr. Rexroat wrote "[t]here appear to be few limitations in this

-9-

area."  (Id.)

Dr. Rexroat noted that plaintiff exhibited good social skills, and reported that he got along well with other people. (Id.)  He reported socializing with his parents, siblings, and a niece.  (Id.)  Dr. Rexroat noted that there appeared to be mild limitations in this area.  (Tr. 297).  Dr. Rexroat noted that plaintiff was able to sustain concentration, persistence and pace with simple tasks, and that memory functioning appeared to be in the average range.  (Id.)  Dr. Rexroat diagnosed plaintiff with major depression, recurrent, moderate, with very mild psychotic features.  (Tr. 298).

On March 11, 2009, Dr. Rexroat completed a Medical Report on which he checked a box indicating that plaintiff had a "mental and/or physical disability which prevents him/her from engaging in that employment or gainful activity for which his/her age, training, experience or education will fit him/her."  (Tr. 294).

On May 6, 2009, plaintiff underwent radiological study of his lumbar spine at Cape Radiology Group, which was interpreted as being within normal limits.  (Tr. 302).

On May 29, 2009, plaintiff was seen at Healthpoint by Matthew W. Karshner, M.D., "for evaluation for disability under social security."  (Tr. 315).  Plaintiff claimed inability to work due to pain in his right leg and low back due to a "compressed disc" and deformity in the right hip.  (Id.)  Plaintiff stated that his whole right leg hurt and locked at times, that he had muscle tightness, and that sometimes this happened in the left leg as

well.  (Id.)  He reported that he had been told that he had arthritis in all of the joints of his body.  (Id.)  Plaintiff stated that his "[a]rms and hands and legs and feet work okay otherwise." (Tr. 315).

Plaintiff reported that he last worked part time about three years ago, and quit work in 1999 in order to raise his five children.  (Id.)  Plaintiff reported that he was looking for work but had not found anything.  (Id.)  Plaintiff reported that the two oldest children did most of the work around the house, and that plaintiff tried to work when he could.  (Id.)  Dr. Karshner noted that plaintiff did "not give specific answers when asked about housework, driving, or any other jobs." (Tr. 315).  Plaintiff reported that he was continent and able to attend to his own self-care, including bathing and dressing himself.  (Id.)  Plaintiff reported smoking two packs of cigarettes daily.  (Id.)

Plaintiff reported having joint pain, swelling and stiffness, mostly in his back and legs but more generalized at times.  (Tr. 316).  He stated he was generally weak, had lost muscle mass, bruised easily and had trouble walking secondary to pain and weakness.  (Id.)  He also reported numbness in his legs and feet, blackouts, cold intolerance, depression, and insomnia, but was negative for irritability or anxiety.  (Id.)

Upon examination, Dr. Karshner noted that plaintiff was in no distress, but complained of some pulling upon straight leg raise testing, which was otherwise negative.  (Id.)  Plaintiff had intact sensation in his upper extremities, and there was no problem

with tone, muscle mass loss or asymmetry anywhere. (Id.)
Plaintiff's joints were free of redness, swelling, fluid, and
cracking/popping. (Id.) Plaintiff's lower extremities displayed
"intact sensation everywhere on the left with patchy decreases and
sensation in various areas on the right, not matching any given
dermatome or peripheral nerve." (Tr. 316). Plaintiff had 5/5 grip
strength, he was able to walk on his heels, toes, tandem walk, hop,
squat and return from a squatted position without significant
difficulty. (Id.) There was a significant decrease in the lateral
bending of plaintiff's neck, but other ranges of motion were
essentially normal. (Tr. 317). Dr. Karshner wrote that at first,
plaintiff "claimed he could not flex his wrists past 30 or 40
degrees and subsequent measurements showed normal range of motion."
(Id.) Right hip testing was negative for obvious degenerative
joint disease symptoms in flexion, abduction and external rotation,
but plaintiff did complain of pain in the groin upon doing that.
(Id.) Ranges of motion at the hip were normal. (Id.)

Dr. Karshner noted that x-rays of plaintiff's lumbar
spine performed on May 6, 2009 were negative, and showed normal
disc heights, normal joints, and normal bony alignment. (Tr. 317,
421). Dr. Karshner noted that a cervical spine MRI performed on
August 5, 2004 indicated minimal degenerative joint and disc
change, no disc herniations, and no compression of any neural
elements, and an MRI of the soft tissue of the neck performed on
August 9, 2004 showed lymphoid tissue enlargement. (Id.)

Dr. Karshner diagnosed plaintiff with depression,

-12-

"[q]uestion of right hip strain," history of ulcers, and status post thyroidectomy with hormone replacement. (<u>Id.</u>)

Dr. Karshner wrote that plaintiff walked with no significant limp, and required no assistive device. (<u>Id.</u>) He wrote that plaintiff "should be able to perform work related functions including sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling without any functional limitations." (Tr. 317).

On June 1, 2009, Lori Moyers completed a Physical Residual Functional Capacity Assessment. (Tr. 318-24). She opined that plaintiff could occasionally lift 20 pounds and frequently lift ten; could stand and/or walk for at least two hours in an eight-hour workday and could sit for six; and could push and/or pull without limitation. (Tr. 319). She assessed no postural, manipulative or visual limitations, but determined that plaintiff should avoid concentrated exposure to extreme temperatures and vibration, and avoid even moderate exposure to hazards such as machinery or heights. (Tr. 320-22).

On June 8, 2009, James W. Morgan, Ph.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 325-27). In Section I, the "Summary Conclusions" section, Dr. Morgan opined that plaintiff was moderately limited in his ability to understand and remember and carry out detailed instructions, to maintain attention and concentration for extended periods of time, and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 325-26). Dr. Morgan opined that plaintiff was

not significantly limited in all other respects. (Tr. 325-27). In Section III, the "Functional Capacity Assessment" section, Dr. Morgan noted findings from plaintiff's medical records, and opined that the total medical evidence suggested that plaintiff maintained the capacity to perform simple routine tasks on a sustained basis, and that a denial was therefore appropriate. (Tr. 327).

Also on June 8, 2009, plaintiff was seen at Cross Trails for thyroid follow-up. (Tr. 391). He complained of right hip pain, and stated that he continued to smoke. (Id.) He was told to stop smoking, diet and exercise, and continue to follow up. (Tr. 392). He returned on June 22, 2009 and reported multiple motor vehicle accidents and four-wheeler accidents in the past. (Tr. 389). He complained of ongoing lumbar and hip pain, and that his disability claim was pending. (Id.)

Right hip x-rays performed on June 24, 2009 were interpreted as being within normal limits. (Tr. 480). The hip joint space was well-preserved, the right SI joint was within normal limits, and there was no obvious joint effusion or soft tissue calcification. (Id.)

On February 11, 2010, plaintiff returned to Cross Trails and reported left-sided neck pain. (Tr. 387). He returned on March 1, 2010 and reported that his neck felt worse this past weekend, stating that he had been cutting fire wood, and felt a pulling when turning his head. (Tr. 385). He was given medication and advised to observe lifting precautions for a week. (Tr. 386). Plaintiff returned to Cross Trails with neck complaints on March

-14-

19, 2010.  (Tr. 383).

On April 5, 2010, plaintiff was seen by Louis P. Caragine, M.D., Ph.D. at Cape Cerebrovascular & Endovascular Neurosurgery.  (Tr. 428).  Plaintiff reported that he dropped things occasionally, had occasional pain down his right arm, and had pain in his neck, low back, and down his right leg.  (Id.)  Dr. Caragine noted that cervical MRI revealed "some congenital narrowing of the canal but nothing even moderate in nature, if at all mild, some mild disk bulges, and at C4 and C5, he has some cervical spondylosis.  Again it is mild as per the radiology report and as well as my visualization, just mild."  (Id.)  Dr. Caragine opined that plaintiff had "some right arm pain with just a 1 level disk bulge and some mild foraminal stenosis on the left at C4-C5, which is not responsible for that pain."  (Id.)  Dr. Caragine noted that, because plaintiff's anatomy did not match his complaints, an EMG was required of plaintiff's upper and lower extremities.  (Tr. 428-29).

On April 15, 2010, plaintiff was seen at the Saint Francis Medical Center Pain Clinic by Jeffrey S. Steele, M.D.  (Tr. 350).  Plaintiff complained of posterior neck pain with extensions of pain into his shoulders and upper extremities.  (Id.)  Upon examination, he had fair cervical range of motion and tenderness, and decreased sensation to touch in his right thumb and index finger.  (Id.)  Dr. Steele noted that a cervical spine MRI performed on March 12, 2010 showed degenerative cervical disc disease, cervical spondylosis, and mild to moderate cervical spinal

stenosis left greater than right. (Id.) Dr. Steele performed a cervical epidural steroid injection. (Tr. 351).

On April 30, 2010, plaintiff returned to Cross Trails with complaints of a skin rash. (Tr. 381-82).

On May 3, 2010, Dr. Caragine performed nerve conduction study testing which revealed mild diffuse sensorimotor polyneuropathy involving the upper limbs. (Tr. 349). Needle electromyogram of the upper limbs showed no evidence of cervical radiculopathy. (Id.) Radiological study of plaintiff's lumbar spine performed on May 3, 2010 revealed mild diffuse degenerative disease, and mild decreased lumbar lordosis. (Tr. 347-48).

On May 12, 2010, plaintiff presented to Cross Trails for a three-month thyroid follow-up. (Tr. 379). He stated that he had lost weight and was suffering hair loss. (Id.) It is noted that plaintiff denied other problems except lumbar back pain. (Id.)

Plaintiff returned to Dr. Steele on May 13, 2010 and reported no appreciable benefit from the steroid injection. (Tr. 345). Dr. Steele noted that the May 3 nerve conduction study had shown sensory or motor polyneuropathy but no evidence of radiculopathy in either his upper or lower extremities. (Id.) Dr. Steele opined that no further steroid injections should be performed, and that plaintiff should be seen by a neurologist. (Id.)

On May 21, 2010, plaintiff returned to Cross Trails to review test results, and reported lumbar and neck symptoms. (Tr. 377).

On June 16, 2010, plaintiff was seen by Steven Mellies, D.O., at the Neurologic Associates of Cape Girardeau, Inc. (Tr. 423). Dr. Mellies noted that plaintiff complained of rather diffuse arm and leg pain that had been present for at least ten years, some neck pain, no back pain, and occasional numbness in his hands and feet. (Id.) Plaintiff reported that he had undergone various testing and had been told that he had lyme disease, arthritis, neuropathy, and perhaps "Lou Gehrig's disease." (Id.) Plaintiff reported smoking two packs of cigarettes per day. (Id.) He stated that he last worked in 1998 or 1999 and reported that his job had been terminated, and reported that he was "waiting on SSI." (Tr. 423). Dr. Mellies noted the results of plaintiff's most recent testing. (Id.)

Upon examination, plaintiff's neck was supple with full range of motion. (Id.) He was alert and cooperative, had normal strength in both arms and hands, there was no wasting of any muscle groups, and he had good hip flexion, knee extension and ankle extension. (Tr. 424). He had fair pinprick sensation over the hands and forearms. (Id.) Dr. Mellies wrote: "[e]very once in a while he would have some areas that didn't feel as well but it didn't seem to follow any particular Dermatome or radicular pattern." (Id.) In plaintiff's lower extremities, Dr. Mellies noted some decrease to pinprick over the dorsum and plantar surface of the feet, but no sensory loss above the ankles. (Id.) Vibratory sense was fairly well preserved, and straight leg raise testing was negative bilaterally. (Tr. 424). Dr. Mellies noted

that plaintiff complained of rather diffuse discomfort in his arms and legs, and neurological examination did not suggest cervical or lumbar radiculopathy. (Id.) Dr. Mellies noted that EMG was unremarkable, and nerve conduction showed mild findings across the wrist and forearms and mild to perhaps moderate findings in the lower extremities. (Id.) Dr. Mellies started plaintiff on Neurontin. (Id.)

On July 28, 2010, plaintiff saw Dr. Mellies with complaints of diffuse muscle pain and stating that his extremities gave out. (Tr. 490). Dr. Mellies questioned the benefit of Neurontin and listed possible fibromyalgia in his assessment. (Id.) He noted that there was no clinical evidence of C5 radiculopathy. (Id.)

On October 10, 2010, plaintiff saw Dr. Mellies and reported some benefit with the increased Neurontin dosage. (Tr. 490). On October 30, 2010, plaintiff returned to Dr. Mellies for complaints of polyneuropathy. (Tr. 489). He reported diffuse arm and leg pain, mostly in the muscles. (Id.) His Neurontin dosage was increased. (Id.)

On November 8, 2010, plaintiff returned to Cross Trails and reported ongoing lumbar and neck pain that he rated as varying between a three or a ten on a one-to-ten scale. (Tr. 371). He denied hair loss, and stated that he felt bad that he could not provide for his children but denied suicidal intent. (Id.) Plaintiff stated that he was unsure whether he wanted medication for his mood. (Id.) Plaintiff reported smoking cigarettes and

drinking alcohol.  (Id.)

Upon examination, plaintiff was alert, dressed in grease-stained clothing, with grease under his fingernails.  (Tr. 372). He was well-nourished and in no acute distress. (Id.) Plaintiff's neck was normal to palpation, but he was tender in his cervical and lumbar spine. (Tr. 373-73).  His pulses were normal, there was no edema, and neurological examination was normal. (Tr. 373). Psychological examination showed plaintiff to be alert and cooperative, with a normal mood, affect, attention span and concentration, and no depression, anxiety or agitation. (Id.)

Plaintiff returned to Cross Trails on December 8, 2010 and reported that he was unsure whether his medication was working, and that he did not think that counseling had been helpful and had been told he required no follow-up. (Tr. 365).  Plaintiff complained of left-sided neck pain and stated that the pain clinic treatment had not helped, and he also complained of back pain, joint pain, stiffness, depression, and memory loss. (Tr. 365-66). Plaintiff reported that he stacked wood yesterday, and now his neck hurt. (Tr. 365).  He reported "zoning out" while sitting. (Id.) Upon examination, plaintiff was alert and in no acute distress, and it was noted that he had grease on his clothing and under his fingernails. (Tr. 366).  He reported smoking cigarettes and drinking alcohol. (Id.)  Cervical spine range of motion was decreased, and straight leg raise testing was normal. (Tr. 367). Plaintiff had normal sensation, reflexes, coordination, muscle strength and tone. (Id.)

In December of 2010, plaintiff returned to Dr. Mellies and reported episodes of zoning out. (Tr. 491). On February 2, 2011, he returned and reported the same, and also reported getting dizzy when in front of the computer but not with a book or magazine, and also reported diffuse muscle pain. (Tr. 492). Dr. Mellies noted that plaintiff looked pale, but was alert and oriented. (Id.) He noted that plaintiff ambulated fine, and questioned whether the staring spells were related to hypotension. (Id.)

On March 4, 2011, plaintiff returned to Dr. Mellies and reported occasional spells of zoning out, diffuse muscle pain, and a feeling that his feet were on fire, but no dizziness when using the computer. (Id.) Dr. Mellies noted that a routine EEG was normal, (Tr. 492), and the record contains a report of a 24-hour ambulatory EEG performed on March 28, 2011, which failed to demonstrate that the episodes were due to epileptic discharges, and clinical correlation was required. (Tr. 529).

On April 6, 2011, plaintiff was seen at Cross Trails for follow-up for cellulitis and abscess on his left leg. (Tr. 519). He reported that he had been stabbed with a sewing needle at home. (Tr. 515). He reported smoking two packs of cigarettes per day. (Tr. 520). He returned the following day and his wound was examined. (Tr. 515). Plaintiff stated that he preferred to not undergo incision and drainage performed if possible. (Id.) Grease stains were noted on plaintiff's clothing. (Id.)

Plaintiff returned to Cross Trails on April 9, 2011 for check of his left leg cellulitis. (Tr. 513). It was also noted that a cyst was removed, and that plaintiff had an anal/rectal abscess. (Tr. 513-14). He returned on April 11, 2011 for follow up to check the spot on his left leg. (Tr. 511). His wound was cleaned and prepped and he was given Bactrim, and he was instructed to return the following day. (Id.) He returned on April 12, 2011 and reported increased pain at the wound site, and it was noted that the area was more indurated and inflamed. (Tr. 509). It was recommended that he undergo incision and drainage. (Tr. 509-10). He returned on April 13, 2011 with complaints related to the wound, and his dressing was changed. (Tr. 507). On April 14, 2011, he returned for wound care and was also counseled to stop or cut down his cigarette smoking. (Tr. 505). He returned for wound care on April 16, 2011 and April 20, 2011. (Tr. 500-504). On April 30, 2011, he returned for a check of the abscess spot, and denied itching. (Tr. 526). He was again counseled to stop smoking. (Tr. 526-27).

On January 7, 2011, plaintiff returned to Cross Trails for follow up for depression, back pain, and altered mental status. (Tr. 353). Plaintiff reported that he had discussed his "zoning out" with Dr. Mellies and was told it wasn't a seizure or from Neurontin. (Id.) Plaintiff reported neck pain that he rated as a five on a one-to-ten scale. (Id.) He reported taking Motrin and using ice and heat. (Id.) Plaintiff returned on February 22, 2011 and reported taking his medication with no problems. (Tr. 449).

He reported ongoing incidents of zoning out and staring that lasted from fifteen minutes to two hours. (<u>Id.</u>) Plaintiff reported that his neck pain had improved, but that he still had weakness in both legs. (<u>Id.</u>) He reported smoking cigarettes and drinking alcohol. (Tr. 450). Cervical spine range of motion was decreased, and plaintiff denied lumbar tenderness. (Tr. 451). He was alert and cooperative, with a normal mood, a slightly flat affect, no depression, anxiety or agitation, and a normal attention span and concentration. (<u>Id.</u>) He was advised to follow up with Dr. Mellies, quit smoking, and return in six weeks. (<u>Id.</u>)

### III.    The ALJ's Decision

The ALJ determined that plaintiff had not engaged in substantial gainful activity since his application date. (Tr. 12). The ALJ determined that plaintiff had the following severe impairments: "sensorimotor polyneuropathy (mild upper limbs and mild to moderately severe lower limbs), degenerative disc disease, status post thyroidectomy for thyroid cancer, and depression." (<u>Id.</u>) The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (<u>Id.</u>) The ALJ determined that plaintiff retained the residual functional capacity (also "RFC") to:

> perform light work as defined in 20 C.F.R. 416.967(b), meaning the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently; except the claimant can stand/walk a total of 2 hours in an 8 hour work day; the claimant can sit a total of 8 hours in an 8 hour work day; the claimant should avoid dangerous unprotected heights, hazards, or dangerous unprotected moving

-22-

machinery; the claimant should avoid ladders, ropes, and scaffolds; the claimant can occasionally balance, kneel, crouch, crawl, stoop, and climb ramps/stairs; and the claimant is able to perform simple routine tasks.

(Tr. 14).

The ALJ determined that plaintiff could not perform his past relevant work but that, considering his age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers that plaintiff could perform. (Tr. 19). The ALJ concluded that plaintiff had not been under a disability as defined in the Act since March 19, 2009, the date the application was filed. (Tr. 20).

## IV.    Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c. An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial

-24-

evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, if substantial evidence exists to support the administrative decision, this Court must affirm that decision even if the record also supports an opposite decision. Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003); see also Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. In support, plaintiff argues that the ALJ failed to properly evaluate the credibility of his subjective complaints; failed to point to medical evidence supporting the RFC assessment; erred in assigning weight to the opinions of Drs. Rexroat and Morgan; and failed to pose complete and proper hypothetical

questions to the VE.  In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

A.    Credibility Determination

The ALJ in this case determined that plaintiff's subjective allegations were not fully credible.  Plaintiff challenges this determination, arguing that the ALJ dismissed plaintiff's testimony without giving any reason, and also erroneously considered his daily activities.  Plaintiff contends that the ALJ erroneously considered that plaintiff was busy and caring for five children as a single parent when in fact he testified that his older children bore most of his responsibilities.  Review of the ALJ's credibility determination reveals no error.

Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment.  Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).  Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.  Polaski at 1321-22.  In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.

The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, the ALJ wrote that he had considered all of plaintiff's symptoms and the extent to which they were consistent with the objective medical evidence based upon the requirements of 20 C.F.R. § 416.929 and Social Security Rulings 96-

4p and 96-7p. The ALJ explicitly acknowledged his duty to consider the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent they limited his functioning, and acknowledged that symptoms could sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone. (Tr. 14). The ALJ then listed all of the factors from the Eighth Circuit's decision in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984). (Tr. 14-15). The ALJ then analyzed all of the evidence of record, and noted numerous inconsistencies in the record that detracted from plaintiff's subjective allegations of symptoms precluding all work.

The ALJ noted that the objective findings were inconsistent with plaintiff's allegations. The ALJ discussed in detail the findings of all of the objective testing of record which, as summarized above, included MRI, x-ray, and nerve conduction testing performed on plaintiff's cervical spine, lumbar spine, right hip, and upper and lower extremities. Regarding plaintiff's mental status, the ALJ noted the negative results of mental status examinations. The ALJ also noted that information plaintiff gave regarding depression in patient health questionnaires indicated that his depression improved over time. The ALJ also noted that physical examinations repeatedly documented largely normal findings in terms of sensation, tone, mass, symmetry, grip and motor strength, ambulation, reflexes, and vibratory sense. The ALJ noted that the rest of plaintiff's examinations, including neurological examinations, were normal.

-28-

While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that the objective medical evidence fails to support the degree of alleged limitations. 20 C.F.R. § 416.929(c)(2); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir. 1997); <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1186 (8th Cir. 1989) (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); <u>Battles</u>, 902 F.2d at 659 (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

The ALJ noted that plaintiff had only conservative treatment with no surgical intervention. The ALJ noted that plaintiff underwent only one cervical spine injection and had no appreciable benefit from it, and that surgery was never offered or discussed. Claims of disabling pain may be discredited when the record reflects minimal or conservative medical treatment. <u>See Barrett v. Shalala</u>, 38 F.3d 1019, 1023 (8th Cir. 1994) (minimal treatment of back pain and migraine headaches was inconsistent with claims of disabling pain); <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998) (claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment).

Similarly, the ALJ noted that although plaintiff had been prescribed Prozac by his primary care doctor, he never sought treatment from a psychiatrist or other mental health professional. See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)(while not dispositive, the failure to seek treatment may indicate "the relative seriousness of a medical problem"); see also Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (the lack of regular and sustained treatment is a basis for discounting complaints and is an indication that the claimant's impairments are nonsevere and not significantly limiting for twelve continuous months).

The ALJ noted that, although plaintiff saw Dr. Mellies for symptoms related to polyneuropathy, Dr. Mellies never expressed an opinion that plaintiff had any restrictions due to polyneuropathy. See Young, 221 F.3d at 1069 (citing Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (a lack of significant restrictions imposed by a treating physician supported ALJ's finding of no disability).

The ALJ noted that plaintiff's work history was not consistent with a person who had always been consistently work-motivated. A poor work history detracts from a claimant's credibility. Pearsall, 274 F.3d at 1218 (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)).

The ALJ also noted that plaintiff reported to Dr. Karshner that he quit working in order to raise his five children. The Eighth Circuit has found it significant when a plaintiff leaves work for reasons other than disability. Goff v. Barnhart, 421 F.3d

785, 793 (8th Cir. 2005) (claimant stopped working after being fired for slapping a patient, not because of her disability); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that this suggested that his impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (noting that claimant testified that she left her bathroom attendant job due to a lack of transportation, not due to disability).

The ALJ also noted that plaintiff reported to Dr. Karshner that he was looking for jobs but had not found anything. Statements regarding contemplating work and looking for jobs are inconsistent with allegations of totally disabling symptoms. See Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (claimant's record of contemplating work as evidenced by his application for jobs during claimed disability period indicates he did not view his pain as disabling); Barrett, 38 F.3d at 1024 (claimant's statements that he was seeking work inconsistent with disability).

The ALJ also considered plaintiff's daily activities, stating that plaintiff was busy and functioned as a single parent to five children. Plaintiff alleges error, arguing that he testified that his older children had taken over his responsibilities, and that the ALJ failed to properly consider his daily activities. However, as the Commissioner notes, the ALJ was not required to believe plaintiff's subjective allegations. As the ALJ noted, plaintiff refused to provide specific answers to Dr.

-31-

Karshner when questioned about his daily activities. Furthermore, as noted above, the medical records contain several references to plaintiff being observed with grease on his clothing and under his fingernails, which would appear to indicate that plaintiff was engaging in more activity than he testified he was able to do. In addition, the medical records contain references of plaintiff's reports of having played volleyball with his children, and of chopping firewood, activities which are wholly inconsistent with the severely limited range of activities plaintiff testified he was able to perform. An ALJ may discount subjective allegations when they are inconsistent with the record as a whole. Perkins v. Astrue, 648 F.3d 892, 900 (8th Cir. 2011) (citing Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

The undersigned notes that plaintiff testified that he spent the majority of his time sitting in a reclined position. However, there is no objective medical evidence substantiating plaintiff's need to do so. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). Further, the record shows that plaintiff never reported to any of his doctors that he needed to sit in a reclined position for sustained periods of time. Likewise, no doctor determined that plaintiff needed to sit in a reclined position as a medical necessity. Therefore, if plaintiff was not spending a substantial amount of time in a reclined position out of

medical necessity, he must be doing so out of choice. See Craig v. Chater, 943 F.Supp. 1184, 1188 (W.D. Mo. 1996). In addition, as the Commissioner notes, the medical records document that plaintiff was repeatedly observed to have grease on his clothing and under his fingernails, which would not be expected to be found on a person who spent a significant amount of time sitting in a reclined position. While not dispositive, this evidence provides further support for the ALJ's adverse credibility determination.

Contrary to plaintiff's argument, the ALJ in this case did not arbitrarily dismiss plaintiff's subjective complaints. Instead, a review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). When an ALJ seriously considers, but for good reasons explicitly discredits, a claimant's subjective allegations of symptoms precluding all work, that decision should not be disturbed. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Because the ALJ considered the Polaski factors and gave good reasons for discrediting plaintiff's subjective complaints of disabling symptoms, that decision should be upheld. Hogan, 239 F.3d at 962.

B.  RFC Assessment

Plaintiff contends that the ALJ failed to follow SSR 96-8p in that he failed to note the medical evidence he relied on and how that evidence supported the limitations assessed in the RFC. Review of the ALJ's RFC determination reveals no error.

Residual functional capacity is defined as the most a person remains able to do despite his limitations.  20 C.F.R. § 416.945; Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all of the relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793. Because a claimant's RFC is a medical question, an ALJ's RFC assessment must be supported by some medical evidence of the claimant's ability to function in the workplace.  Lauer, 245 F.3d at 704; see also Kroqmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).

In the case at bar, the ALJ exhaustively analyzed and discussed all of the medical evidence of record, and described in detail the manner in which the objective testing, including mental status examination, radiological testing, electromyogram and nerve conduction studies, and EEG were either normal or revealed mild findings.  The ALJ concluded that "[t]he clinical signs are inconsistent with [plaintiff's] allegations of the severity of his

symptoms." (Tr. 16). The ALJ also wrote that he was giving considerable weight to the opinion of Dr. Karshner who, as summarized above, determined that plaintiff had no limitations in his ability to sit, stand, walk, lift, carry, handle objects, hear and speak, and had no work-related limitations.

Plaintiff argues that the RFC determination fails to account for his sensorimotor polyneuropathy. However, as the Commissioner notes, plaintiff identifies no medical evidence in the record suggesting that sensorimotor polyneuropathy precluded the RFC as determined by the ALJ, nor does examination of the record reveal any such evidence. Examination failed to reveal any significant problem with reaching overhead, and the record fails to show that plaintiff routinely complained about an inability to reach overhead when seeking medical care. (Tr. 313, 316-17, 384). Even so, as the Commissioner notes, the ALJ gives plaintiff the benefit of the doubt and included in his RFC a lifting restriction of 20 pounds occasionally, addressing the mild upper extremity polyneuropathy, and limiting standing/walking, balancing, kneeling, crouching and stooping to account for plaintiff's mild to moderate lower extremity polyneuropathy. While plaintiff suggests that Dr. Karshner's opinion cannot support the ALJ's findings in this regard because it was dated before April of 2010, when plaintiff first exhibited polyneuropathy complaints, the undersigned notes that none of the medical records generated after that date suggest that plaintiff had limitations greater than those assessed by Dr.

Karshner and included by the ALJ in his RFC assessment. As noted above, Dr. Mellies never opined that polyneuropathy imposed any restrictions. In addition, when plaintiff presented for treatment at Cross Trails in 2011, well after the onset of polyneuropathy, plaintiff failed to report complaints related to polyneuropathy that were consistent with the alarming symptoms he described during the administrative hearing. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment.) The ALJ incorporated limitations greater than those established by the medical opinion evidence, and plaintiff points to no evidence supporting the conclusion that sensorimotor polyneuropathy imposed greater limitations.

### 1. Dr. Rexroat's Opinion

The ALJ also wrote that he was giving considerable weight to the opinion of Dr. Rexroat, who examined plaintiff on March 4, 2009 and provided a Psychological Evaluation Report indicating his opinion that plaintiff could understand and remember simple instructions and sustain concentration, persistence and pace with simple tasks, could adapt to his environment, had intact memory, could calculate and concentrate, and perform serial threes, findings consistent with plaintiff's treatment records from his primary care physician. See (Tr. 296-97). On March 11, 2009, Dr. Rexroat completed a Medical Report form on which he checked a box indicating that plaintiff had a "mental and/or physical disability

which prevents him/her from engaging in that employment or gainful activity for which his/her age, training, experience or education will fit him/her." (Tr. 294). Plaintiff alleges error, arguing that the ALJ did not in fact give Dr. Rexroat's opinion considerable weight because Dr. Rexroat opined that plaintiff's mental impairment would preclude gainful activity. Review of the ALJ's decision reveals no error.

First, plaintiff somewhat overstates the opinion Dr. Rexroat expressed on the Medical Report form. There, Dr. Rexroat checked a box indicating that plaintiff had a "mental and/or physical disability" precluding employment. Such a statement is insufficiently specific to be considered as a definitive statement that plaintiff had a mental impairment precluding work. Even if it were, it is clearly established that medical provider statements that a claimant is disabled or unable to work are not entitled to deference because a "medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (citing Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004)).

Furthermore, as the Commissioner correctly notes, the ALJ wrote that he was giving Dr. Rexroat's opinion considerable weight, not controlling weight. Plaintiff also fails to note that, when the ALJ wrote that he was giving Dr. Rexroat's opinion considerable

weight, he cited to the medical report found at pages 295-98 of the administrative transcript, not to Dr. Rexroat's Medical Report form found at page 294. The report cited by the ALJ is consistent with his RFC assessment. Finally, even a treating physician's check marks on a questionnaire are conclusory opinions that may be discounted if, as in this case, they are contradicted by other objective medical evidence in the record, especially when that other evidence is that doctor's own records. See Stormo, 377 F.3d at 805-06; Hogan, 239 F.3d at 961; see also Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) (noting the limited probative value of a "checklist" RFC assessment); see also Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996) (It is appropriate to disregard statements of opinion by a treating physician that "consist[s] of nothing more than vague, conclusory statements.") The undersigned finds no error in the ALJ's treatment of Dr. Rexroat's opinion or the ALJ's statement that he was giving Dr. Rexroat's opinion considerable weight.

2.   Dr. Morgan's Opinion

The ALJ also wrote that he was giving Dr. Morgan's opinion considerable weight. As summarized above, Dr. Morgan reviewed plaintiff's medical records and determined, in Section III of his Mental Residual Functional Capacity Assessment form, that plaintiff maintained the capacity to perform simple routine work functions on a sustained basis. In Section I, however, Dr. Morgan checked boxes indicating some "moderate" restrictions. In his RFC

assessment, the ALJ accounted for Dr. Morgan's opinion in Section III by limiting plaintiff to the performance of simple routine tasks.  Plaintiff alleges error, arguing that Dr. Morgan's opinion was inconsistent with the ALJ's determination because Dr. Morgan indicated, in Section I, that plaintiff had moderate limitations which were inconsistent with the ALJ's RFC assessment.  (Tr. 325-26).  Review of the ALJ's decision reveals no error.

As the Commissioner correctly notes, the Program Operations Manual System ("POMS") to the form completed by Dr. Morgan provides guidance to medical experts on how to complete the form.  POMS § DI 24510.060.B.2 provides that "**Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment."**  POMS § DI 24510.060.B.2, https:// secure.ssa.gov/ apps10/poms.nsf/lnx/0424510060 (last accessed March 15, 2013) (emphasis in original).  POMS § DI 24510.060.B.3 provides that Section III, the Functional Capacity Assessment portion of the form, is for recording the mental RFC determination, and that it is in this section that "the **actual mental RFC assessment is recorded**, explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." https:// secure.ssa.gov/ apps10/poms.nsf/lnx/ 0424510060 (last accessed March 15, 2013) (emphasis in original).  Plaintiff's argument that there is no evidence that Dr. Morgan

actually followed POMS § DI 24510.060.B when completing the form is not persuasive, nor is his argument attempting to interpret the instructions from POMS § DI 24510.060.B in his favor. "Because the actual assessment is contained in Section III, courts have consistently held that it is not error for an ALJ to omit restrictions identified in Section I in his RFC analysis." <u>Sitzman v. Astrue</u>, 2012 WL 1437281, *9 (D. Neb. 2010) (citing <u>Kane v. Astrue</u>, 2011 WL 3353866, *3 (N.D. Ohio 2011) (collecting cases)). The undersigned finds no error in the ALJ's consideration of Dr. Morgan's opinion.

Plaintiff argues that the ALJ erroneously omitted mental limitations from the RFC, and failed to point to medical evidence to support the RFC assessment. Indeed, an ALJ should "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including functions such as sitting, standing, and walking. <u>Depover</u>, 349 F.3d at 567 (quoting S.S.R. 96-8p, 1996 WL 374184, at *1). In <u>Depover</u>, the Eighth Circuit noted that an ALJ's failure to make the function by function assessment "could result in the adjudicator overlooking some of an individual's limitations or restrictions." <u>Id.</u> The <u>Depover</u> Court noted that, in <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 568-69 (8th Cir. 1999), the ALJ's decision was reversed on this basis because the ALJ had failed to "specify the details" of the claimant's RFC, and instead described it "only in general terms," leaving it unclear whether substantial evidence

supported the ALJ's decision that the claimant could return to his past relevant work.  Id.

In the case at bar, however, (as in Depover) the ALJ did not merely describe plaintiff's RFC in "general terms."  See Id. Instead, as noted above, the ALJ conducted a detailed analysis of the evidence of record and of plaintiff's testimony, and formulated a specific RFC that took into account all of plaintiff's limitations that the ALJ found credible and supported by the record.  Plaintiff also fails to acknowledge that the ALJ's RFC determination was influenced by his finding that plaintiff's allegations were not fully credible and, for the reasons discussed above, this Court defers to that determination.  See Hogan, 239 F.3d at 962; Tellez, 403 F.3d at 957.  The undersigned further notes that, during the administrative hearing, when plaintiff was asked why he could not work, he cited his "physical condition, my weakness and the legs and the arms.  But basically the physical condition."  (Tr. 34).  While plaintiff did testify to mood swings including depression and anxiety, he did not appear to place great emphasis upon these conditions as the reasons he could not work. While not dispositive, this provides further support for the ALJ's decision.

Having carefully reviewed the record, it is apparent that the ALJ's RFC determination was made following a comprehensive examination of the record, and it does not appear that the ALJ overlooked any limitations.  While the ALJ did not present his RFC

findings in bullet-point format with each limitation immediately followed by a discussion of the supporting evidence, such a rigid format is not required by Social Security Ruling 96-8p. The ALJ thoroughly analyzed all of the medical and non-medical evidence, performed a legally sufficient analysis of the credibility of plaintiff's subjective allegations, and then formulated a specific RFC that took into account all of plaintiff's limitations caused by his medically determinable impairments that the ALJ found to be credible and supported by the record. See <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 591 (8th Cir. 2004) (medical records, physician observations, and plaintiff's subjective statements may be used to support the RFC). Because some medical evidence supports the ALJ's RFC determination, it must stand. See <u>Steed v. Astrue</u>, 524 F.3d 872, 876 (8th Cir. 2008).

C.   <u>Vocational Expert Testimony</u>

Finally, plaintiff argues that the ALJ erred in relying upon the vocational expert's testimony because it did not account for all of his limitations. The undersigned disagrees.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001) (citing <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1015 (8th Cir. 2000)). An ALJ may omit alleged impairments from a hypothetical question when there is no medical evidence that such impairments impose any restrictions on

the claimant's functional capabilities.  <u>Haynes v. Shalala</u>, 26 F.3d 812, 815 (8th Cir. 1994).

As explained, <u>supra</u>, substantial evidence supports the ALJ's RFC and credibility determinations, the ALJ properly considered and weighed the medical opinion evidence, and properly explained his rationale for the weight given.  Likewise, the hypothetical questions he posed to the VE included all the impairments he found to be credible.  <u>See</u> <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072-73 (8th Cir. 2004)(VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination.)  It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated."  <u>Hunt</u>, 250 F.3d at 625 (citing <u>Long v. Chater</u>, 108 F.3d 185, 187 (8th Cir. 1997)).

Therefore, for all of the foregoing reasons, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed.  Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.2001); <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be affirmed.

The parties are advised that they have until **April 1, 2013,** to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
_____
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of March, 2013.